UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

GREGORY L. SCOVILLE,

      Plaintiff,

v.                           No. 3:12-cv-520-RV-EMT

CITY OF DEFUNIAK SPRINGS,
FLORIDA,

      Defendant.

_____ /

## PLAINTIFF SCOVILLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY

### I.     INTRODUCTION

Defendant City of DeFuniak Springs ("City") employed Plaintiff Gregory Scoville ("Scoville") as its Planning Director. In this position, Scoville directed the implementation of the City's comprehensive land-use and development plan by coordinating development approval and review, reviewing plots, investigating proposed conditional uses, and helping to draft land use ordinances. Although Scoville worked a desk job, the City uniformly subjected Scoville—and all employees without regard to their position—to a suspicionless, random drug test ("Random Drug Testing Policy"). When Scoville was selected to submit to the Random Drug Testing Policy and provide a urine sample, he refused, citing his right to be free from unreasonable governmental searches. As a result, the City

fired him.  The blanket drug testing mandated by the City's Policy, and the City's consequent termination of Plaintiff, violate the Fourth Amendment.

Under Fourth Amendment case law, the government may not subject employees to drug testing without reasonable suspicion of drug use except in a narrow set of circumstances involving employees in high-risk, safety-sensitive jobs.  *See Chandler v. Miller*, 520 U.S. 305, 323 (1997) ("where . . . public safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search").  The City fails to properly limit its Random Drug Testing Policy to safety-sensitive employees who are specially trained to work with uncommon equipment that poses grave risks to public safety.  Instead, it subjects its entire workforce to suspicionless urinalysis.  Because Plaintiff Scoville and many of his former colleagues subject to suspicionless drug testing perform no safety-sensitive functions and work in ordinary office environments where drug abuse could be detected through testing based on individualized suspicion, the City's Random Drug Testing Policy is unconstitutional.

Plaintiff therefore moves the Court to enter partial summary judgment against the City declaring that the City's Random Drug Testing Policy, which applies to all City employees without regard to their position or tasks, violates the Fourth and Fourteenth Amendments both facially and as applied to him, and

therefore the City's termination of Scoville was unconstitutional.

## II.     STATEMENT OF MATERIAL FACTS

Pursuant to N.D. Fla. Loc. R. 56.1(A), Scoville submits the following

statement of material facts:

1.     In March 2006, the City hired Scoville as its Planning Director. The

City Planning Director directs the implementation of the City's comprehensive

land-use and development plan.  The Planning Director provides technical

assistance to the Planning Board and coordinates all development approval and

review, including site plan approval, subdivision review, land use and zoning

changes, and supervision of code enforcement activities.  The City Planning

Director reviews plots, investigates proposed conditional uses, reviews contracts,

and helps to draft ordinances involving land use issues.  As Planning Director,

these were Scoville's job responsibilities throughout his employment with the City.

Scoville's job duties did not involve drug interdiction, carrying a firearm, or

working in a safety sensitive position.  The bulk of Scoville's work is conducted in

his office from his desk. In his typical workday, he routinely interacted with co-

workers and supervisors, who were able to observe his behavior.  Am. Answer.

(DE 17), ¶ 8.

2.     The State of Florida does not license or specifically regulate city

planners.  City planning is not highly regulated for safety; any planning safety

concerns do not depend on the physical fitness of the planners.  The City did not

subject Scoville to a medical or fitness examination before hiring him.  Scoville

Decl. (DE 20-1), ¶ 3.

3.      As part of his Planning Director job responsibilities, Scoville drove a

Chevrolet Impala that the City assigned to the planning department on about three

short trips per month.  Scoville never drove a City car or vehicle that required the

operator to possess a commercial driver's license.  Rarely did Scoville drive a City

car with another passenger in the car.  Scoville Decl. (DE 20-1), ¶ 4.

4.      No significant drug abuse problem existed or exists among City

employees.  Scoville Decl. (DE 20-1), ¶ 2.

5.      In 2010, the City adopted its Drug Free Workplace Policy (DE 1-1).

Am. Answer. (DE 17), ¶ 9.  Pursuant to this policy, the City subjects its employees

to several types of drug testing schemes, including suspicionless, random drug

testing ("Random Drug Testing Policy"). DE 1-1 at pp. 10-12.  The Random Drug

Testing Policy applies to *all* employees without regard to their position. *Id*. at

p. 11.  The Random Drug Testing Policy subjects employees to surveillance during

the collection of the urine.  *Id*. at p. 7.  Employees must abide by the terms of this

policy "as a condition of employment."  *Id*. at p. 4.

6.     On April 5, 2010, Scoville acknowledged receiving a copy of the City's Drug Free Workplace Policy (DE 1-1).  Scoville understood that as a City employee, he would be bound by the City's Random Drug Testing Policy, unless he immediately resigned.  As "a condition of employment," he had to sign a form acknowledging receipt of the written policy and agree to comply with the City's Random Drug Testing Policy.  Am. Answer. (DE 17), ¶ 13.

7.     In September 2012, the City selected Scoville to undergo a random drug test pursuant to the City's Random Drug Testing Policy.  Am. Answer. (DE 17), ¶ 14-15.  The only reason the City requested Scoville's urine sample was because he had been randomly selected pursuant to its Random Drug Testing Policy.  Am. Answer. (DE 17), ¶ 15.

8.     Scoville refused to provide a urine sample pursuant to the Random Drug Testing Policy.  Am. Answer. (DE 17), ¶ 16.

9.     Scoville gave City Manager Sara Bowers a memorandum explaining the reasons why he refused to provide a urine sample.  Am. Answer. (DE 17), ¶ 17. A true and accurate copy of this memorandum is filed as docket entry (DE) 20-2. Scoville Decl. (DE 20-1), ¶ 4.  In the memorandum, Scoville asserted that the Random Drug Testing Policy violated his Fourth Amendment right to be free from unreasonable searches because his position was not a safety-sensitive position.

DE 20-2.  Scoville also gave Bowers a copy of *Wenzel v. Bankhead*, 351 F. Supp.

2d 1316 (N.D. Fla. 2004) and two media reports about other random drug testing

cases.  Scoville Decl. (DE 20-1), ¶ 4; DE 20-3.

10.     On September 24, 2012, the City Council unanimously voted to

terminate Scoville's employment solely as a result of his "refusal [to submit to] a

random drug test" as required by the City's Random Drug Testing Policy.  Scoville

spoke against the Council's termination, citing the *Wenzel* decision.  Am. Answer.

(DE 17), ¶ 19.

### III.   MEMORANDUM OF LAW

### A.     Standard for Application.

"Summary judgment is appropriate where the evidence shows 'that there is

no genuine issue as to any material fact and that the [movant] is entitled to a

judgment as a matter of law.'" *Ellis v. England,* 432 F.3d 1321, 1325 (11th Cir.

2005) (quoting *Comer v. City of Palm Bay, Fla.,* 265 F.3d 1186, 1192 (11th Cir.

2001)).  In disputing a material fact, it is insufficient for the nonmoving party

"simply [to] show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Instead, the nonmoving party must produce enough evidence to enable a jury to

reasonably find for the nonmoving party on that issue.  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 249 (1986).

**B.    The City's Random Drug Testing Policy Violates the Fourth Amendment Facially and As-Applied Because it Unnecessarily Invades the Employee's Privacy Interests without any Special Need.**

The City's drug testing scheme of its employees constitutes a search subject to the Fourth Amendment of the U.S. Constitution.  *See Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 616-17 (1989) ("There are few activities in our society more personal or private than the passing of urine. . . .  Because it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable . . . these intrusions must be deemed searches under the Fourth Amendment.").  For a search to be reasonable and thus constitutional, it generally must be based on individualized suspicion of wrongdoing.  *Chandler v. Miller*, 520 U.S. 305, 308 (1997).  Yet, in "certain limited circumstances" "special needs" warrant "particularized exceptions" to the individual-suspicion requirement and would justify a random drug testing scheme of public employees.  *Id.* at 308, 313 (quoting *Skinner*, 489 U.S. at 619).  However, no "special need" justifies the City subjecting *all* employees to its Random Drug Testing Policy.  It therefore is facially[1] unconstitutional and unconstitutional as applied to Scoville.

_____

[1] *See Baron v. City of Hollywoord*, 93 F. Supp. 2d 1337, 1339 n.1, 1342 (S.D. Fla. 2000) (holding a drug testing policy *facially* unconstitutional, despite the government's argument that *some* of these applicants could clearly be tested, because in "no set of circumstances" could the

The "particularized exceptions" to the requirement for individualized suspicion are limited to a "closely guarded category" of cases. *Chandler*, 520 U.S. at 309. Only when three conditions are met will the suspicionless drug testing pass constitutional muster. First, to justify a random drug testing scheme, the City must show[2] "an important governmental interest"—a special need "beyond the normal need for law enforcement"—justifying the drug testing scheme. Second, the City must show that "the privacy interests implicated by the search are minimal." Third, the City must show that a requirement of individualized suspicion would jeopardize its interests. *See Skinner*, 489 U.S. at 624 ("In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion."); *Chandler*, 520 U.S. at 318 ("[T]he proffered special need for drug-testing must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized

government show a special a need to test *all* employees as the policy mandates) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (noting disagreement among the Court as to *Salerno*'s strict test for a facial challenge and greater consensus as to a more lenient one).

    [2] The government bears the burden of establishing a "clear direct nexus" between the circumstances of the individual searched and the nature of the feared violation. *See Baron*, 93 F. Supp. 2d at 1340. Symbolic needs do not establish that nexus. *See Chandler*, 520 U.S. at 322.

suspicion.").  Because the City cannot make any of these showings, let alone all of them, its broad Random Drug Testing Policy does not qualify for a "particularized exception[]" and is therefore unconstitutional.[3]

### 1.     The City has no special need for a suspicionless drug testing scheme.

The U.S. Supreme Court held in two cases that the "special needs" exceptions to the requirement of individualized suspicion justified random drug testing of public employees.  Neither of those cases is comparable to the facts here.

In *Skinner v. Ry. Labor Execs.' Ass'n*, in light of significant evidence of alcohol abuse by railroad employees on the job, the Court held that the government's "surpassing safety interests" in preventing train accidents were a special need justifying suspicionless drug testing of railroad employees involved in a major train accident or who violated certain safety rules.  489 U.S. at 606-08, 634 (1989).  The Court explained that because railroad employees, like those with

---

[3] Because these three cases involving suspicionless drug testing in the employment context are directly on point, this analysis does not discuss the Supreme Court's decisions involving suspicionless drug testing in other contexts less relevant to the question here.  These other cases involve suspicionless testing of public school students, where the Court has focused on the government's "custodial and tutelary responsibility" and emphasized students' limited privacy interests in this environment, *see Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656-57 (1995) (upholding suspicionless drug testing of public school athletes); *Bd. of Educ. v. Earls*, 536 U.S. 822, 830-31 (2002) (upholding suspicionless drug testing of students in competitive extracurricular activities), and surreptitious testing of obstetrical patients that resulted in criminal prosecution, *see Ferguson v. City of Charleston*, 532 U.S. 67, 85-86 (2001) (holding such testing to be unconstitutional).

"routine access to dangerous nuclear power facilities," hold safety-sensitive jobs, which involve extraordinary instrumentalities (railroads) that are "fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences," the government has a compelling interest in testing them without a showing of individualized suspicion.  *Id.* at 628.  The *Skinner* safety-sensitive special need is inapplicable to Scoville.

Scoville's common desk job stands stark in contrast to risks involved in an extraordinary activity like the operation of a railroad.  The Planning Director's impairment does "not pose the kind of safety risk that attends operation of a train or other dangerous instrumentality." *See Wenzel*, 351 F. Supp. 2d at 1325 (ruling the position of long-term strategic planner at the Florida Department of Juvenile Justice presented no such risk to create a "special need" exception).  A Planning Director is simply not what the *Skinner* court was envisioning when exempting safety-sensitive positions involving unusual and significant risks to public safety from the general prohibition on suspicionless drug testing of employees.

In *National Treasury Employees Union v. Von Raab*, a divided[4] Court held constitutional the drug testing of Customs Service employees who were required to carry a firearm on the job or who were directly involved in drug interdiction.  489 U.S. 656, 668-71 (1989).  The Court reasoned that the government had a special need to ensure government agents who carry a firearm and "may use deadly force" were sober because impaired perception and judgment when using an uncommon workplace instrumentality (a gun) could result in death.  *Id*. at 670 (quoting *Skinner*, 489 U.S. at 428).  Additionally, the government has a special need to ensure Custom agents who interdict drugs neither are indifferent to their assignment nor actively assist the criminals to import the drugs because the agents are using drugs themselves.  *Id*. at 670.  The Court focused on the unique mission of the Customs Service and the government's "compelling interests in safeguarding our borders and the public safety."  *Id.* at 677.  *Von Raab* stands in contrast to Scoville as well.

Scoville's job assignments do not require him to carry a firearm or participate in drug interdictions.  To complete his work responsibilities, the City Planner need not use any item comparable to a gun that presents such uncommon

---

[4] The four dissenters would have found drug testing of even these safety-sensitive employees unconstitutional, as "a kind of immolation of privacy and human dignity in symbolic opposition to drug use."  *Id.* at 681 (Scalia, J., dissenting).

and grave risks to public safety.  Furthermore, drug smugglers cannot compromise his integrity because he does not encounter them.  Accordingly, the special needs identified in *Von Raab* are inapplicable.

In *Chandler v. Miller*, the Court clarified the special needs attendant in *Skinner* and *Von Raab* by rejecting as insufficient generalized interests in public safety and sober decision-making.  520 U.S. 305 (1997).  *Chandler*, which considered whether Georgia could drug test candidates for Georgia's highest public offices—including governor, judges, and legislatures—concerns job responsibilities (desk work, policy considerations, thoughtful professional judgments and calculations) are more like Scoville's tasks.  And in this context, the Court rejected any special need to drug test these policy professionals.  The Court insisted upon a "concrete danger," one that is "real and not simply hypothetical," that animates the special need.  *Id*. at 319.  It rejected a general concern for "official's [sober] judgment and integrity" created a special need.  *Id*. at 318; *see also id*. at 312 (noting Judge Barkett's dissent that rejects suspicionless testing when "[t]here is nothing so special or immediate about the generalized governmental interests involved").  With no such real danger or extraordinary instrumentality necessitating the policy, it was unconstitutional.  If the U.S. Supreme Court rejected suspiciousless drug testing of public officials to ensure their judgment was sound and sober, Scoville's planning work likewise presents no

special need.[5]  *Chandler* teaches that no special need warrants suspiciousless drug testing of Scoville, who like "ordinary public employees, or even high public officials, [] work in offices and ought to be sober, but who do not have direct contact with the drug trade, and whose impairment would not pose the kind of safety risk that attends operation of a train or other dangerous instrumentality." *Wenzel*, 351 F. Supp. 2d at 1324.

Following *Chandler,* other courts have struck down blanket policies requiring across-the-board testing of all employees.  For example, in *American Federation of State and County Municipal Employees v. Scott*, 857 F. Supp. 2d 1322, 1341 (S.D. Fla. 2012), *appeal docketed*, No. 12-12908 (11th Cir.), where an executive order required suspicionless drug testing of all executive branch agency employees in an effort to "improve governmental operations and public confidence in government employees generally," the court found these aims did not amount to a special need as they were essentially the same as the symbolic needs articulated in *Chandler.  Accord Nat'l Fed'n of Fed. Emps. v. Vilsack*, 681 F.3d 483, 497-98

---

[5] In *Chandler*, the Court struck down Georgia's drug-testing law even though the testing was limited to a handful of people, unlike the drug-testing challenged here, which applies to every City employee.  *Id.* at 309-10.  In addition, the Court struck down Georgia's law even after finding that it was "relatively noninvasive," in that it could take place in the candidate's private physician's office, and the candidate could control the release of the test results.  *Id.* at 312, 318.  The City's drug-testing regime here, which requires surveillance of employees producing a urine sample at work, is not so accommodating.

(D.C. Cir. 2012) (finding U.S. Forest Service Job Corps policy requiring random drug testing of *all* employees in order to maintain Zero Tolerance Policy among residential students at Job Corps Centers did not constitute special need because some employees subject to testing had limited or no contact with these students). Similarly, in *Wenzel*, 351 F. Supp. 2d at 1324-25, which involved suspicionless drug testing of employees at the Department of Juvenile Justice, the Northern District of Florida held that the mere possibility of harm was not enough to justify testing a long-term strategic planner.  The court struck the policy even while acknowledging that DJJ has a law enforcement mission directed toward at-risk children.  *Id.*  The court explained that the government must show more than a mere desire to improve the overall quality of the State's public workforce:

> The bottom line is this.  In order for a state to subject an employee to random drug testing, it is not enough that there is a generalized interest in sober public employees who perform their jobs well and keep the public trust.  Nor is it enough that others in the same agency have duties that make it especially important that those employees remain drug free.  Nor is it enough that a far-fetched possibility can be conjured under which the employee at issue could, if under the influence of drugs, bring about some harm.  Had these been enough, the result in *Chandler* would have been different.  There must be, instead, a concrete risk of real harm.

*Id.* at 1324-25.  In *Wenzel,* Chief Judge Hinkle determined the long-term planner, like Scoville, presented no "concrete risk of real harm" and therefore the state could not force him to submit to a drug test.

Lastly, Scoville's operation of a City car for public business—which required no commercial driver's license or other special driving permit, and in

which he rarely transported passengers and never security-sensitive materials—

does not transform his position into one posing a special threat to public safety to

warrant suspicionless drug testing.  A car is an ordinary part of modern life, not an

extraordinary instrumentality (like a train or a gun) that is dangerous and thus only

used by select and specially regulated employees.  *Compare, e.g.*, *Am. Fed'n of

Gov't Emps. v. Sullivan*, 787 F. Supp. 255, 257 (D.D.C. 1992) (in striking down

random drug testing of couriers and mail clerks who operate motor vehicles but do

not carry passengers, observing:  "The government's interest here is the safety risk

that an impaired government driver might pose to other drivers on the road.  While

not insubstantial, this is obviously no different than the interest the public and the

government have in keeping any potentially impaired driver off the road. If this is a

sufficient 'special government need' to permit warrantless searches under *Von

Raab*, 489 U.S. at 665, then the federal government could proceed to test any and

all drivers on the road."); *Nat'l Treasury Emps. Union v. Watkins*, 722 F. Supp.

766, 769-70 (D.D.C. 1989) (enjoining random drug testing of employees required

to drive cars and vans because the risks of them driving and carrying out their

duties "are no greater than the normal risks associated with vehicle use by the

general public"); *Nat'l Treasury Emps. Union v. Lyng*, 706 F. Supp. 934, 947

(D.D.C. 1988) (enjoining suspicionless drug testing of employees required to drive

a daily shuttle bus, mail van, and passenger cars), *with Krieg v. Seybold*, 481 F.3d

512, 518 (7th Cir. 2007) (allowing suspicionless drug test of employee who drove a one-ton dump truck, a dump truck with a plow, a front loader, and a backhoe, and distinguishing him from drivers of vans and passenger cars in *Watkins* and *Lyng*); *Am. Fed'n of Gov't Emps.v. Thornburgh*, 798 F. Supp. 597, 599 (N.D. Cal. 1991) (allowing random testing of employees operating vehicles who carry passengers or security-sensitive material). Because driving a passenger car involves no special risk absent from everyday life in America, it does not create a special need for the government to randomly drug test its employees.

### 2.    Plaintiff has a robust privacy interest in his bodily fluids.

Scoville, like all City employees, has a significant privacy interest regarding in the collection and analysis of his bodily fluids. *See Skinner*, 489 U.S. at 602, 617 ("It is not disputed, however, that chemical analysis of urine, like that of blood, can reveal a host of private medical facts about an employee, including whether he or she is epileptic, pregnant, or diabetic. Nor can it be disputed that the process of collecting the sample to be tested, which may in some cases involve visual or aural monitoring of the act of urination, itself implicates privacy interests.").

Notably, unlike other government positions warranting a "special need" for random drug testing, Scoville's "expectations of privacy … are [not] diminished by reason of [his] participation" in a highly regulated industry or position. *Skinner*,

489 U.S. at 627, 627 n. 8 (privacy diminished by the government's pervasive regulation of railroad safety, which depends on the fitness of railroad workers, and its "periodic physical examinations"); *Von Raab*, 489 U.S. at 677, 672 (privacy diminished by requisite background investigations, medical examinations, or other intrusions as well as job's demands for fitness and dexterity).  City planning is not highly regulated for safety; any planning safety concerns do not depend on the physical fitness of the planners; Planning Directors are not subjected to medical examinations or other fitness tests.  Scoville's industry and job qualifications—like many of the City's other office workers—do not diminish his privacy interests.

Furthermore, unlike the regulation in *Skinner* that permitted the urine sample to be collected without "the direct observation of a monitor," *id.,* 489 U.S. at 626, the City's "employee [is] subject to surveillance" during the urine collection.  *See* Policy (DE 1-1) at 7.  This further invades the employees' privacy.  Therefore, any drug testing must be based on individualized suspicion.

### 3. The City's interests can be furthered notwithstanding a requirement for individualized suspicion before drug testing.

Even if the City's general interests in its employees' judgment, job performance, and safety were sufficient to justify drug testing of some kind, the City would still have to show that these interests "would be placed in jeopardy by a requirement of individualized suspicion," *see Skinner*, 489 U.S. at 624, as to every

single employee it seeks to test, including Plaintiff.  This the City cannot do.  Here,

Plaintiff has established that as the Planning Director for the City, he mostly

worked in the confines of his office where he routinely interacted with and was

observed by co-workers and supervisors.  As the Supreme Court suggests in

*Chandler*, it is likely "feasible" in "more traditional office environments [where]

day-to-day scrutiny . . . is the norm" for supervisors to develop reasonable

suspicion about an employee before ordering a drug test.  520 U.S. at 321 (citing

*Von Raab*, 489 U.S. at 674 (upholding suspicionless testing of customs officers in

part because it was not feasible to monitor them in the field)).  Because the City

cannot show that drug testing based on individualized suspicion would be

ineffective as to all of the employees it seeks to test—*i.e.*, its entire workforce—

including Plaintiff in his former desk job, it has failed to establish a special need

for suspicionless urinalysis.

## C.     Scoville's Involuntary "Consent" Does Not Waive His Privacy Rights Because Universal Employee Testing by the Government Is an Unconstitutional Condition.

On April 5, 2010, when the City provided Scoville with a copy of its Drug

Free Workplace Policy (DE 1-1), as a "condition of employment," the City

required Scoville agree to abide by the Policy and Scoville complied.

Nevertheless, the City's attempted exaction of involuntary consent to an otherwise

unconstitutional search in exchange for continued employment violates the

doctrine of unconstitutional conditions.  Accordingly, Scoville did not waive any privacy rights to be free from unreasonable government searches.

Although an individual "has no 'right' to a valuable government benefit," the government may not "deny a benefit to a person on the basis that infringes on his constitutionally protected interests."  *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) ("The theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.") (citation omitted).  *See also Bourgeois v. Peters*, 387 F.3d 1303, 1325 (11th Cir. 2004) ("The doctrine of unconstitutional conditions prohibits terminating benefits, though not classified as entitlements, if the termination is based on motivations that other constitutional provisions proscribe.") (citation omitted); *United States v. Scott*, 450 F.3d 863, 866 (9th Cir. 2006) (noting that waiver of Fourth Amendment rights is limited by unconstitutional conditions doctrine); *Pike v. Gallagher*, 829 F. Supp. 1254, 1263 (D.N.M. 1993) (finding no consent to drug testing even where employee had submitted to urinalysis upon transfer within employment, as "[e]mployment cannot be conditioned upon the waiver of a constitutional right"). The unconstitutional conditions doctrine is based primarily on the notion that the government may not accomplish indirectly—by coercively withholding a right or privilege—what it cannot do directly.  *Elrod v. Burns*, 427 U.S. 347, 359 (1976).

Put another way, requiring employees to submit to mandatory testing on pain of otherwise losing their job is coercion, not voluntary consent.  *See Bostic v. McClendon*, 650 F. Supp. 245, 249 (N.D. Ga. 1986) (where public employees participated in mandatory suspicionless urinalysis drug testing program out of fear that they would otherwise lose their jobs, holding their "consent to search was obviously not voluntary, but was the result of coercion").  *Accord AFSCME v. Scott*, 857 F. Supp. 2d at 1339-40 (rejecting argument that state employees consented to suspicionless drug testing and explaining "the fact that the covered employees have the option to submit to the drug tests or seek other employment does not make the search reasonable under the Fourth Amendment"); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1063 n.3 (6th Cir. 1998) (voluntary waiver of constitutional right does not foreclose constitutional claim of privacy rights); *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia,* 812 F.2d 105, 112 (3d Cir.1987) (same).  Plaintiff and other City employees, therefore, cannot be deemed to have consented to suspicionless, across-the-board drug testing merely by seeking to retain employment with the City.

## IV.   CONCLUSION

Based on the foregoing arguments and authorities, Plaintiff respectfully requests that this Court enter partial summary judgment on his behalf and rule that the City's Random Drug Testing Policy and consequent termination of Plaintiff's

employment violates his Fourth Amendment rights.

 Dated:        January 4, 2013

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed today the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all persons registered for this case, including any opposing counsel that have appeared.

**Respectfully Submitted,**


<u>/Benjamin James Stevenson</u>
**Benjamin James Stevenson**
Fla. Bar. No. 598909
ACLU Found. of Fla.
P.O. Box 12723
Pensacola, FL  32591-2723
T. 786.363.2738
F. 786.363.1985
bstevenson@aclufl.org

**Yvette Acosta MacMillan**
 Fla. Bar. No. 0854300
ACLU Found. of Fla.
P.O. Box 25477
Tampa, FL 33622-5477
T. 813.288.8390
F. 813.289.5694
yacostamacmillan@aclufl.org

**Randall C. Marshall**
Fla. Bar No.: 181765
RMarshall@aclufl.org
**Shalini Goel Agarwal**
Fla. Bar No.: 90843
sagarwal@aclufl.org
ACLU Found. of Fla.
4500 Biscayne Blvd., Ste. 340
Miami, FL 33137
T. 786.363.2700
F. 786.363.1108

*Counsel for Plaintiff Scoville*